*To be argued by*
REBECCA J. GANNON
*(15 minutes)*

# New York Supreme Court

## APPELLATE DIVISION – SECOND DEPARTMENT

**PEOPLE OF THE STATE OF NEW YORK,**

*Respondent,*

*– against –*

**BRIAN CHAMBERS,**

*Defendant-Appellant.*

*TO BE HEARD ON THE ORIGINAL RECORD*

Richmond County
Ind. No. 31/16

A.D. No. 16-09813

## BRIEF FOR DEFENDANT-APPELLANT

LYNN W. L. FAHEY
*Attorney for Defendant-Appellant*
111 John Street, 9th Floor
New York, N.Y. 10038
(212) 693-0085

Rebecca J. Gannon
*Of Counsel*

September 2017

# **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 5531 ................................................................ 1

PRELIMINARY STATEMENT ................................................................................ 2

QUESTIONS PRESENTED .................................................................................... 3

STATEMENT OF FACTS ...................................................................................... 3

    Introduction .................................................................................................... 3

    *Sandoval* Hearing .......................................................................................... 5

    The People's Opening Statement .................................................................. 7

    The People's Trial Evidence ......................................................................... 8

        The November 28, 2015 Incident ............................................................ 8

        The December 2, 2015 Incident ............................................................ 11

    The Court's Ruling on Officer Stephanie Bowman's Testimony ...................... 15

    Court's Mischaracterization of the Minivan Testimony ................................... 16

    The Defense Motion to Dismiss ................................................................... 17

    The Court's Instruction Following the Defense Summation ............................ 18

    The People's Summation and the Court's Instruction Regarding the I-card .... 19

    Deliberations and Verdict ............................................................................ 20

ARGUMENT ..................................................................................................... 21

POINT I

    APPELLANT'S CONVICTION FOR RECKLESS ENDANGERMENT IN THE FIRST DEGREE  FOR THE DECEMBER 2ND INCIDENT WAS LEGALLY INSUFFICIENT AS THERE WAS NO EVIDENCE THAT APPELLANT ACTED WITH "DEPRAVED INDIFFERENCE TO HUMAN LIFE" .................... 21

POINT II

    APPELLANT WAS DENIED DUE PROCESS AND THE RIGHT TO TESTIFY BY THE COURT'S *SANDOVAL* RULING WHICH ALLOWED THE PEOPLE TO ELICIT THAT HE HAD PREVIOUSLY BEEN CONVICTED OF ATTEMPTED RECKLESS ENDANGERMENT DURING AN INCIDENT WHEN HE ALLEGEDLY DROVE A CAR DURING A POLICE CHASE – FACTS IDENTICAL TO THE CURRENT OFFENSE .................... 28

POINT III

    THE COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WHEN IT ADMITTED IRRELEVANT AND EXTREMELY PREJUDICIAL TESTIMONY THAT THE OFF-DUTY POLCE OFFICER WHOSE CAR WAS HIT WAS PREGNANT ................................................................................28

POINT IV

    THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WHEN IT GAVE NUMEROUS UNNECESSARY INSTRUCTIONS TO THE JURY THAT AFFIRMATIVELY MISSTATED WITNESS TESTIMONY, SIGNIFICANTLY UNDERMINED THE DEFENSE, AND HIGHLIGHTED EVIDENCE PREJUDICIAL TO APPELLANT.. 35

CONCLUSION ............................................................. 43

CERTIFICATE OF COMPLIANCE ........................................... 44

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,          :

                    Respondent,          :

                 -against-          :

BRIAN CHAMBERS,          :

               Defendant-Appellant.          :

----------------------------------------------------------------------x

## STATEMENT PURSUANT TO RULE 5531

1.  The indictment number in the court below was 31/16.

2.  The full names of the original parties were People of the State of New York against Brian Chambers.  The names of the parties have not changed on appeal.

3.  This action was commenced in Supreme Court, Richmond County.

4.  This action was commenced by the filing of an indictment on February 19, 2016.

5.  This appeal is from a judgment convicting appellant, after a jury trial, of one count of reckless endangerment in the first degree, one count of reckless endangerment in the second degree, two counts of reckless driving, three counts of criminal mischief, two counts of obstruction of governmental administration in the second degree, and three counts of leaving the scene of an accident.

6.  This is an appeal of a judgment of conviction rendered on August 22, 2016.

7.   Appellant has been granted permission to appeal as a poor person on the original record.  The appendix method is not being used.

PRELIMINARY STATEMENT

Appellant Brian Chambers appeals from an August 22, 2016 judgment of the Supreme Court, Richmond County, convicting him, after a jury trial, of one count of reckless endangerment in the first degree [P.L. § 120.25], one count of reckless endangerment in the second degree [P.L. § 120.20], two counts of reckless driving [V.T.L. § 1212], three counts of criminal mischief [P.L. § 145.00(03)], two counts of obstruction of governmental administration in the second degree [P.L. § 195.05], and three counts of leaving the scene of an accident [V.T.L. § 0600(01)].   The court sentenced him to 3 to 6 years in prison for reckless endangerment in the first degree, to run concurrently with 1-year prison terms for the reckless endangerment in the second degree, criminal mischief in the fourth degree, and obstruction of governmental administration counts, and a 3-month jail term for the reckless driving counts, along with a $250 fine for the leaving the scene of an accident counts (Ozzi, J., at trial and sentence).

Appellant filed a timely notice of appeal. On October 24, 2016, this Court granted him leave to proceed as a poor person and assigned Lynn W. L. Fahey as appellate counsel. No stay has been sought, and appellant is currently incarcerated pursuant to the judgment. Appellant had no co-defendants.

<u>QUESTIONS PRESENTED</u>

1.  Whether appellant's conviction for reckless endangerment in
    the first degree for the December 2nd incident was legally
    insufficient as there was no evidence that appellant acted
    with "depraved indifference to human life."

2.  Whether appellant was denied due process and the right to
    testify by the court's *Sandoval* ruling which allowed the
    People to elicit that he had previously been convicted of
    attempted reckless endangerment during an incident when
    he allegedly drove a car during a police chase – facts identical
    to the current offense.

3.  Whether the court violated appellant's due process right to a
    fair trial when it admitted irrelevant and extremely prejudicial
    testimony that the off-duty police officer whose car was hit
    was pregnant.

4.  Whether the trial court violated appellant's due process right
    to a fair trial when it gave numerous unnecessary instructions
    to the jury that affirmatively misstated witness testimony,
    significantly undermined the defense, and highlighted
    evidence prejudicial to appellant.

<u>STATEMENT OF FACTS</u>

<u>Introduction</u>

Appellant was charged with first degree reckless endangerment and related
counts arising from incidents on November 28 and December 2, 2015, in both of which
he led police on a high speed chase in Staten Island.

In the first incident, officers in two unmarked police cars attempted to box in a
Honda CRV driven by appellant after he allegedly committed a traffic
infraction. Appellant drove off, striking the open passenger side door of one of the

3

police cars.  The police gave chase and appellant did not pull over, drove in excess of the speed limit, ran stop signs and red lights, and failed to use his turn signal before the officers called off the pursuit.  The officers issued an I-card for appellant.

In the second incident, and in connection with the I-card, a group of officers in two unmarked cars went to appellant's address, where they observed him enter a Mazda.  The police cars attempted to box in appellant but he drove off, striking the front of one of the police cars.  The police gave chase and appellant did not pull over, drove in excess of the speed limit, ran red lights, and crossed the double yellow lines while driving through the middle of traffic and around other cars.  At one intersection, there may have been pedestrians present who stepped away suddenly from the street and the officers claimed several cars had to stop short during the pursuit.  Although one officer testified that appellant clipped a minivan, causing it to fishtail, that officer's partner did not recall appellant hitting it.  Nevertheless, the court interjected and misstated that officer's testimony, telling the jury that they had just heard that the minivan had been hit.  The pursuit continued, during which appellant scraped and damaged the car of an off-duty officer, Stephanie Bowman, who was travelling home from work.  Over defense counsel's objection, the trial court permitted the People to elicit that Officer Stephanie Bowman was pregnant at the time her car was hit.  The police eventually called off the pursuit and no injuries were alleged.

Under the court's *Sandoval* ruling, the People were permitted to ask appellant about his prior conviction for attempted reckless endangerment, in which he drove

recklessly while being pursued by the police and nearly struck a pedestrian, notwithstanding the similarity between that offense and the charged crimes.

Following the defense's summation, the People objected that defense counsel had erroneously argued that proof appellant was afraid was a defense to the leaving the scene of an accident charges.  The trial court agreed and, over objection, awkwardly paraphrased defense counsel's closing and then instructed the jury to disregard that argument without making clear that this related only to the leaving the scene of an accident counts.

Finally, when the People displayed the I-card with appellant's photo during summations, the judge interrupted, pointed out that there was a police department logo on the card, and stated that did not mean that appellant had a propensity for committing crime.  The jury acquitted appellant of reckless endangerment in the first degree for the November 28th incident, but convicted him of the remaining charges.

### *Sandoval* Hearing

During the pre-trial *Sandoval* hearing, the People asked to cross-examine appellant on the underlying facts of all twelve of his prior convictions, the majority of which were for drug possession, but included a February 2009 conviction for attempted reckless endangerment in the second degree, in which appellant allegedly wove in and out of traffic and almost struck a pedestrian while allegedly attempting to flee police

(H. 5-11).[1]  Defense counsel argued that questioning appellant about the reckless endangerment conviction would be unduly prejudicial because it involved similar facts as the charged crimes, including that he was driving a vehicle, and implied appellant's criminal propensity (H. 15).  If the People were permitted to inquire, it would also have a chilling effect on appellant's ability to testify (H. 15).

The court ruled that the People could ask appellant about his prior convictions for petit larceny, knowing possession of stolen property, and attempted reckless endangerment (H. 30-32).  The court also ruled that the People could inquire about the underlying facts of the attempted reckless endangerment conviction (H. 32).  In explaining its ruling, the court stated:

> I do realize that there is a similarity between that one and the facts before the Court now.  I do realize that there is a similarity and by review of the cases on this issue say that that similarity in and of itself is not a reason to exclude it.  So it's still the Court's discretion even though it is similar to the acts here.  And I believe I am going to permit it on that ground (32).

Defense counsel again objected to the People inquiring about the attempted reckless endangerment conviction because the facts were so similar to the charged crimes, but was overruled (H. 33).

---

[1] Numbers without prefixes refer to the trial minutes.  Those preceded by "H." refer to the minutes of *Sandoval* hearing, dated July 11, 2016.

The People's Opening Statement

During opening statements, the People laid out their theory that, on two separate occasions, appellant drove a motor vehicle on the public highways with depraved indifference to human life and created a grave risk of death to others (25). In describing the second incident, the prosecutor told the jury that they would hear from a police officer who was driving home when appellant hit her car (38-39). The prosecutor stated, "You are going to hear from Stephanie Bowman. You are going to hear from her about how she was almost eight months pregnant" (39). After the court overruled defense counsel's objection to this remark, the People continued:

> She was almost eight months pregnant when her car was struck as she is just driving home. She will tell you how her car after she was hit drove up onto the side. On the curb there is some grass there right after four corners road. You will also hear from Stephanie, she went to the hospital after – (39).

Defense counsel again objected (39). At sidebar, counsel specified that not only was any mention of Bowman being pregnant improper but also that she went to the hospital, since no medical records had been provided to the defense, and telling the jurors this would mislead them into believing that Bowman suffered injuries in addition to stressing the fact that she was pregnant (39). The court, while recognizing that injuries were not a necessary element of any the charges against appellant (40), allowed the prosecutor to comment that Bowman went to the hospital because it went "to

whether or not there was a risk" (41).  Defense counsel noted an objection on the record (41).

The People's Trial Evidence

The November 28, 2015 Incident

On November 28, 2015, at approximately 8:30 p.m., Detective Arthur Truscelli and his partner, Officer Andrew Kinsella, were in plain clothes and driving an unmarked rental car while patrolling the Stapleton neighborhood of Staten Island (Truscelli: 49-52; Kinsella: 204-205).  Their car had no dash camera or radio, but was outfitted with lights and sirens that could be activated (Truscelli: 51; Kinsella: 207).  While driving, the officers observed a black Honda CRV with a male driver they recognized as appellant and decided to follow it (Truscelli: 62, 106; Kinsella: 208, 216-17).

Truscelli and Kinsella stayed directly behind appellant as he made two left turns before making a right hand turn without signaling (Truscelli: 62-66, 103; Kinsella: 212-13; People's Ex. 4-8).  At that point the officers decided to pull over the vehicle but waited to do so, continuing to follow appellant without turning on any lights or sirens as he pulled over and stopped next to parked cars (Truscelli: 103-105; Kinsella: 214-16; People's Ex. 4; People's Ex. 5).  Around that time, Sergeant Luppino and his partner, Detective Clyde Moyer, who were also patrolling the area in plain clothes and an unmarked rental car, came on the scene and saw Truscelli and Kinsella in their car and appellant double parked on the side of the road (Moyer: 167-71, 193; Kinsella: 244).

8

Rather than using the traditional procedure of pulling over appellant using police lights, the officers decided to use a "tactical car stop" with both police cars (Truscelli: 104-105; Moyer: 170-71; Kinsella: 216). Without activating their lights or sirens, Truscelli and Kinsella pulled their unmarked car in front of appellant at an angle and, only a few seconds later, Moyer and Luppino pulled their car in behind appellant (Truscelli: 105-107; Moyer: 171-73, 196; Kinsella: 221, 244). Once his car stopped, Kinsella opened the passenger door, at which time appellant's engine revved and his car moved forward (Truscelli: 109; Moyer: 173; Kinsella: 222). As appellant drove past, he struck the front passenger side door of Kinsella and Truscelli's car, bending the door all the way back before it snapped back at a 45 degree angle (Truscelli: 109-110; Moyer: 173; Kinsella: 222). Kinsella attempted to pull the door closed but it would not close all the way so he had to hold the door shut as Truscelli held him by the arm (Truscelli: 110-111; Kinsella: 222-23). Truscelli and Kinsella followed appellant, who was going about 40 to 50 miles per hour (Truscelli: 113; Moyer: 177; Kinsella: 223). Moyer and Luppino attempted to follow appellant in their car but lost sight of him after a very short distance and stopped pursuing him (Moyer: 175-76).

Truscelli and Kinsella continued to pursue appellant and, at the first intersection, both officers saw him use his brake lights but alleged that he did not obey the stop sign before making a right turn (Truscelli: 114-16; Kinsella: 226; People's Ex. 6). At the next intersection, appellant again tapped his brakes before turning but failed to signal (Truscelli: 117; Kinsella: 227). Appellant then accelerated and was travelling between

50 and 60 miles per hour (Truscelli: 119; Kinsella: 228-29). When he reached the intersection of Targee and Broad, he failed to stop at the red light; Truscelli alleged that a car travelling in the direction of the green signal hit its brakes and he heard skidding, but Kinsella did not recall if there was any other motorist on the road (Truscelli: 119-22; Kinsella: 230). Truscelli also claimed that there were a few people standing in the parking lot of a gas station on the corner (Truscelli: 121-22); but Kinsella made no mention of this. Truscelli did not know if any of the intersections appellant drove through had cameras and Truscelli did not have his radar gun on him that day so he could not check appellant's actual speed (Truscelli: 163).

Given the distance between them and appellant at this point, the officers decided to return to the police precinct, as their car was no longer drivable (Truscelli: 122; Kinsella: 230). There was damage to the front door and front right side of their car and the door did not close, which cost almost $2,000 to repair (Truscelli: 122-27; Kinsella: 231-33; Doug Zuniga [Rental Car Employee]: 246-251; People's Ex. 14). Upon returning to the precinct, the officers generated an I-card for appellant (Truscelli: 128).

The December 2, 2015 Incident

On December 2, 2015, Officer Mirel Hoxha and Officer Nicholas Rentas became aware of the I-card associated with appellant, who they were already familiar with, having observed him during a separate encounter a week earlier (Hoxha: 254-57; Rentas: 375, 377). Hoxha and Rentas, in plain clothes and riding in an unmarked police

vehicle outfitted with lights and sirens but lacking a dash camera, went to appellant's address at 85 Notre Dame Avenue along with Sergeant Cabello and Officer Nicholas Podaras, who travelled in a separate car (Hoxha: 256-58, 357-58; Rentas: 377-78; Podaras: 453-55).

When they arrived, they observed a dark grey Mazda 6 and a Honda CRV, the latter of which was associated with the I-card (Hoxha: 268, 277; Rentas: 378-79). The officers parked on opposite corners and, after approximately ten to fifteen minutes, observed appellant walk over to the Mazda and get inside (Hoxha: 278-81, 285; Rentas: 38-83; Podaras: 431-37). Appellant drove up to the stop sign and began to inch over to make a right hand turn (Hoxha: 282). At that point, the officers decided to box appellant in, with Hoxha and Rentas's car moving in front of him and the other officers' car moving in behind (Hoxha: 283; Rentas: 381-82). When they did so, appellant accelerated and struck the front of Hoxha and Rentas's car, scraping it along the front bumper and headlight, before continuing to the right down Lamoka (Hoxha: 283, 286; Rentas: 382; Podaras: 459).

The two police cars pursued appellant, travelling down Lamoka through a residential area, and Hoxha claimed that at one point appellant was probably going about 60 miles per hour (Hoxha: 288; Podaras: 458-61). Appellant failed to signal when he made a turn onto Brookfield Avenue, and drove through four stop signs without braking or stopping as he continued through an area that was primarily residential with some commercial businesses (Hoxha: 289-95, 297; Rentas: 386-89; People's Exs. 19-

11

22).  At the intersection of Arthur Kill and Brookfield, appellant made a right without stopping at the sign or signaling, although he slowed down, and another car travelling on Arthur Kill had to suddenly apply its brakes (Hoxha: 296; Rentas: 390).

Hoxha testified that, as appellant approached the intersection of Giffords and Arthur Kill, there were approximately ten to fifteen cars stopped at the light; Rentas mentioned only two to three vehicles, however (Hoxha: 298; Rentas: 392).  In any event, the light had just turned green and appellant crossed the double yellow lines, rode that way through the intersection, and then crossed back onto the right side of road, going about 40 to 50 miles per hour (Hoxha: 299-300; Rentas: 392; People's Ex. 24).  Appellant then approached the intersection of Arthur Kill and Clark, where the right turn light was green and cars were travelling down Clarke (Hoxha: 301-02; Rentas: 393; People's Ex. 25).  Appellant again crossed the double yellow lines and one or two cars had to swerve to avoid him (Hoxha: 301-304; Rentas: 394).  Continuing along Arthur Kill, appellant made a right turn onto Richmond Road and failed to signal, although the light at the intersection may have been green (Hoxha: 304-05; Rentas: 395-96; People's Ex. 26).

At Richmond and Light House, appellant drove around cars on the right side of the road, crossed the double yellow line, and ran the red light, but once again returned to the right side of the road after the intersection, travelling somewhere between 50 and 60 mph (Hoxha: 306-308; Rentas: 401-03; People's Ex. 27).  At this point, Podaras and

Kinsella's car stopped participating in the chase since their car's windshield fogged up; only Hoxha and Rentas continued to follow appellant (Podaras: 464).

At the next intersection of Wilder and Riedel, appellant again crossed the double yellow lines to pass vehicles and then moved back onto the right side of the road (Hoxha: 309).  In total, Hoxha claimed that appellant crossed the yellow lines three to four times (Hoxha: 309).  At the intersection of Richmond Road and Amboy Road, appellant made a left, travelling at about 40 miles per hour, and failed to signal, although the light was green (Hoxha: 309-10; Rentas: 404-05; People's Ex. 28).

Appellant then approached the intersection of Richmond Road and New Dorp Lane, where the light was red (Hoxha: 312; Rentas: 405-06).  Appellant was in the right lane with one to two cars in front of him and three to four cars in the left lane (Hoxha: 312; Rentas: 405-06).  When the officers moved in behind to box him in, appellant moved in between two cars in the left lane (Hoxha: 312-13; Rentas: 405-06).  The officers then intentionally hit appellant with their car when he was stopped, to try to end the pursuit, but appellant continued driving (Rentas: 395-96).

When appellant moved to the opposite side of the road to make the right turn onto New Dorp, Hoxha claimed that three to four pedestrians walking in the street jumped back onto the sidewalk as a car that was making a left onto Richmond drove onto it (Hoxha: 314-15; People's Ex. 30).  Appellant continued on New Dorp Lane, driving around 45 to 50 miles per hour while passing through three intersections with

13

green lights (Hoxha: 316-17).  At certain points, he crossed onto the opposite side of the road or switched lanes without signaling (Hoxha: 317; Rentas: 408).

At the intersection of Richmond and Todt Hill Road, several cars were stopped at a red light and appellant crossed the double yellow lines, went through the light, and turned left without signaling (Hoxha: 319-20; Rentas: 408-09, People's Ex. 31).  Hoxha claimed that appellant drove up Todt Hill Road between the double yellow lines, splitting traffic as he went with cars moving out of the way, but conceded that he failed to note this in his memo book (Hoxha: 320-21, 361-62; People's Ex. 32).  Todt Hill was a very curvy road with cars travelling in both directions, and, according to Hoxha, at one point appellant sideswiped a minivan and it fishtailed and turned (Hoxha: 330-31; Rentas: 409).  Rentas never said that appellant struck the minivan, only that its brake lights came on, and when the officers returned later to the area, the minivan was not there, its driver never called the police, and no accident report was filed (Hoxha: 363-64; Rentas: 410).

At the intersection of Todt Hill and Four Corners, appellant drove on the opposite side of the road, hugging the double yellow lines, and travelled through the intersection while the light was red (Hoxha: 333; Rentas: 411-12).  Appellant then sideswiped a dark Ford Explorer and the Explorer pulled over to the right while appellant continued going up Todt Hill at about 40 miles per hour, on top of the double yellow line and between traffic (Hoxha: 334; Rentas: 412-13).  At that point, the police

called off the pursuit and appellant proceeded through a red light before getting on the expressway towards Brooklyn (Hoxha: 336-38; Rentas: 412-15).

Hoxha and Rentas found damage to their bumper and the passenger side headlight, amounting to $3,891.55 in repairs (Hoxha: 339-40; Rentas: 415; Raymond Sellers [NYPD]: 426-31; People's Exs. 46, 47). While at the precinct, the same dark Ford Explorer that the officers had seen earlier pulled in, driven by Officer Stephanie Bowman, which had a dent and some scrapes along the driver's side (Hoxha: 341-43; People's Ex. 35, 36, 37).

The Court's Ruling on Officer Stephanie Bowman's Testimony

Prior to Stephanie Bowman testifying, the parties had a sidebar conversation to address possible testimony that she was pregnant at the time of the incident and had gone to the hospital, which defense counsel objected to as inflammatory and prejudicial (477-78). The trial court ruled that the prosecutor could elicit that Bowman "was expecting at the time but nothing else about injuries or going to the hospital," reasoning that, "balancing the respective interests," the fact that Bowman was pregnant was "mentioned as part of the continuum, just to let [the jury] know" (477).

Bowman testified that on December 2, 2015, she was driving her Ford Explorer home from work at the 122nd Precinct when she saw police lights in her rear view mirror (Officer Stephanie Bowman: 479-80). Because she was pregnant at the time, she was on limited duty at work (Bowman: 488). Bowman felt a car hit her car on the

driver's side and heard a scraping sound (Bowman: 480-81).  She then saw a dark Mazda pass her car with a police car following it (Bowman: 481).  She saw the Mazda drive on the yellow lines between traffic, before she turned around and drove her car back to the precinct (Bowman: 481-84).  After the incident, there were dents and scratches on her car resulting in $5,300 worth of repairs (Bowman: 485-86).

Court's Mischaracterization of the Minivan Testimony

Prior to its admission, defense counsel had sought to preclude evidence regarding appellant allegedly striking the minivan during the December 2nd incident, since the owner was never found and it was not separately charged (270-74).  The trial court ruled that it would allow in this evidence but would give an instruction that it did not amount to a separate crime (274).  After Hoxha testified that appellant hit the minivan, the court thus stated:

> Members of the jury, I just want to advise you at this point that you've heard some testimony about that Mazda 6 observed by this witness sideswiping a particular minivan and that it fishtailed.  The defendant is not specifically charged with any type of crime in the indictment as a result of this.  So that is not direct evidence of the crimes for which he is accused of.  But I'm permitting it just to get you to understand what the witness here says he observed and saw and sensed during this time, just over a continuum of events that he did so, remembering that he is not specifically accused of or charged with anything relating to this sideswiping of this minivan that this witness just testified about (331).

When Hoxha's partner Rentas testified, however, he said that he only observed the brake lights on the minivan come on, but never said that appellant actually hit it (Rentas: 410). Nevertheless, the court immediately gave the following instruction to the jury:

> Again, members of the jury, I just want to remind you similarly what happened with the other witness. Mr. Chambers is not charged separately with anything or it's not alleged that he's charged with any crimes solely *by hitting this silver minivan as was testified here*. I'm just permitting this for the sole purpose of the continuity of events, if you will, so that the testimony, there's no gaps in it and it makes sense to you. Again I'll just remind you that he's not accused of or charged with *hitting this minivan as with regard to the testimony you heard* (410) (emphasis added).

The Defense Motion to Dismiss

At the close of the People's case, defense counsel moved to dismiss the two counts of reckless endangerment in the first degree (one for each incident) as legally insufficient, arguing that reckless driving alone does not establish the required *mens rea* of depraved indifference, relying on *People v. Maldonado*, 24 N.Y.3d 48 (2017) (504-12). Comparing the case to *Maldonado*, defense counsel stated, "In [*Maldonado*], the Court of Appeals said that the action of a motorist, when it checks brakes, when it changes lanes to escape a collision and gets back into the proper lane, all those actions show a lack of depraved indifference to human life and that's what we have here" (509). The court denied the motion, ruling that there was no bright line rule that certain

conduct was depraved or not, the cases were very fact specific, and here, the facts were legally sufficient (528-31).

The Court's Instruction Following the Defense Summation

Defense counsel urged in summation that the main issue in both incidents was whether appellant's actions evinced depraved indifference (542). Counsel also focused on the police's behavior as to the November 28th incident – specifically, that on a dark night, they were wearing street clothes and not driving police cars, for which reasons appellant might have been afraid and thought that he was getting carjacked (544-45).

Once defense counsel finished, the People objected, asserting that counsel had implied that if appellant was afraid, his actions were lawful, but in fact this was not a defense to the leaving a scene of an accident counts (569-71).  The parties agreed that, in response, the court would remind the jurors in its charge that they had to follow the court's instructions on the law (571).

After a recess, the court announced *sua sponte* that it had reflected on its earlier ruling and concluded that it needed to instruct the jury immediately that "reasonable fear" is not a defense to leaving the scene of an accident (583).  Defense counsel argued vigorously against that approach, emphasizing that the defense had presented an entire narrative, not just that one piece (583-84).  Further, counsel argued that it was improper for the court to instruct the jury to disregard part of the defense closing at this point in time, since it would prejudice appellant for the court to comment on a charge in the

18

indictment and the People to sum up immediately after that (587-88). Counsel suggested that, instead, the court should wait until it instructed the jurors on the law (585). The court disagreed, ruling that it "[had] to do it" now to correct any misimpression on that charge (588).

The court then instructed the jurors that it wanted to call their attention to defense counsel's closing argument about "leaving the scene of an accident without reporting" (590). After roughly paraphrasing counsel's argument, the court then stated: "But to the extent that you understood his argument to mean at that time the driver of the vehicle didn't stop because of some possible fear for his safety, unknown persons were following him in a car he didn't recognize and things of that nature, that's not a defense to it." (590-91). The People then began their summation (591-92).

The People's Summation and the Court's Instruction Regarding the I-card

Prior to summations, the People put on the record that they wished to display the I-card to the jury (531-32). The defense objected that the presence of appellant's mugshot on the I-card made it highly prejudicial because the jury would infer that he previously had been arrested, and since the jury had already heard testimony about the I-card, displaying it again was unnecessary (532). The court ruled that the I-card could be shown, including appellant's mugshot, and there was no discussion about any instruction relating to it (534).

The prosecutor displayed the I-card during his summation and called the jury's attention to appellant's photograph (594).  The court then interjected, pointing out the police department logo on it and saying: "The fact that [there is a logo] is not evidence that [appellant] or the person indicated has any propensity to commit a crime or predisposed to commit a crime. It's permitted for the limited purpose of showing the basis of the identification that the witness who saw that made and for that purpose only" (594).

Later, describing the second incident, the prosecutor said that appellant "caused grievous harm to others there, the other motorists, the pedestrians" (611).  In particular, he argued that appellant sideswiped the minivan and "[m]ore importantly, you heard from Stephanie Bowman, *pregnant Stephanie Bowman,* that her vehicle was sideswiped, that vehicle, as she was on her way home" (613) (emphasis added).

Deliberations and Verdict

During deliberations, the jury sent out a note asking when Bowman's accident report was filed and requested her "testimonial" (673).  After being asked to clarify, the jury sent another note requesting to see a copy of the accident report relating to Bowman, testimony from her from the time she was hit until she went to the precinct, and her entire cross-examination by the defense (673-78).  The jury was informed that there was no accident report for Bowman in evidence and her requested testimony was

read back to the jury (679-82).  Approximately an hour later, the jury reached a verdict (684).

With regards to the November 28th incident, the jury acquitted appellant of reckless endangerment in the first degree, but convicted him of reckless endangerment in the second degree and the remaining charges.  With regards to the December 2nd incident, the jury convicted him of reckless endangerment in the first degree and all other charges (684).

## ARGUMENT

## POINT I

APPELLANT'S CONVICTION FOR RECKLESS ENDANGERMENT IN THE FIRST DEGREE FOR THE DECEMBER 2ND INCIDENT WAS LEGALLY INSUFFICIENT AS THERE WAS NO EVIDENCE THAT APPELLANT ACTED WITH "DEPRAVED INDIFFERENCE TO HUMAN LIFE."

A conviction for reckless endangerment in the first degree requires that the People meet the high bar of proving both that the circumstances evinced a "depraved indifference to human life" and that the defendant recklessly engaged in conduct which created "a grave risk of death to another person."  N.Y. Penal § 120.25.  Here, appellant was convicted of reckless endangerment in the first degree for the December 2nd incident, notwithstanding that, at most, he clipped two cars, resulting in minimal damage; slowed down at times; and purposefully attempted to avoid other cars, all of which failed

to establish that he acted with the required *mens rea* of depraved indifference. Therefore, his conviction for reckless endangerment in the first degree was legally insufficient and the People failed to prove his guilt beyond a reasonable doubt. *See* U.S. Const., Amend. V, XIV; N.Y. Const., Art. I, § 6; *Jackson v. Virginia*, 443 U.S. 307, 313–320 (1979); *In re Winship*, 397 U.S. 358, 364 (1970); *People v. Santos*, 38 N.Y.2d 173 (1975).

In assessing evidence for legal sufficiency, the court must "determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the [fact-finder] on the basis of the evidence at trial." *People v. Cahill*, 2 N.Y.3d 14, 57 (2003). In the process, the court must view the evidence in the light most favorable to the prosecution. *People v. Contes*, 60 N.Y.2d 620, 621 (1983).

"A person is guilty of reckless endangerment in the first degree when, under circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person." P.L. § 120.25. While the act itself is relevant, the Court of Appeals has stressed that "depraved indifference to human life is a culpable mental state." *People v. Feingold*, 7 N.Y.3d 288, 294 (2006). Determining whether a defendant possessed this *mens rea* "is highly fact-sensitive, requiring a case-by-case analysis." *People v. Jakobson*, 119 A.D.3d 815, 818 (2d Dept. 2014).[2]

---

[2]    Apart from the *actus reus*, second degree depraved indifference murder, first degree depraved indifference assault, and first degree reckless endangerment all require

Depraved indifference is "best understood as an utter disregard for the value of human life -- a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not." *Feingold*, 7 N.Y.3d at 296. It is embodied in conduct that is "so wanton, so deficient in a moral sense of concern, so devoid of regard of the live or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes [serious physical injury] to another." *People v. Suarez*, 6 N.Y.3d 202, 211 (2005). "In other words, a person who is depravedly indifferent is not just willing to take a grossly unreasonable risk to human life - that person does not care how the risk turns out. This state of mind is found only in rare cases." *People v. Lewie*, 17 N.Y.3d 348, 359 (2011).

Recently, the Court of Appeals explained that a critical element of determining whether the defendant acted with depraved indifference in the context of a reckless driving case is whether he attempted to avoid hitting cars or pedestrians – conduct which demonstrates that he sought to mitigate the risks arising from his actions, and thus did *not* act with depraved indifference. *People v. Maldonado*, 24 N.Y.3d 48 (2014). In *Maldonado*, the defendant stood trial for depraved indifference murder after he led the

---

proof of "circumstances evincing a depraved indifference to a human life." *See* P.L. §§ 120.10(3), 120.25, 125.25(2). For this reason, the Court of Appeals has recognized that this element has the same meaning in all three statutes. *See People v. Feingold*, 7 N.Y.3d 288, 290 n.1 (2006); *People v. Suarez*, 6 N.Y.3d 202, 225 (2005) (Graffeo, J., concurring and dissenting in part).

police on a high speed chase through a populated area, drove well above the speed limit, ran multiple red lights, drove on the wrong side of the road, and went the wrong way down a one street before ultimately striking and killing a pedestrian. *Id.* During the chase, multiple vehicles had to swerve to avoid hitting the defendant's car. *Id.* at 50. Nevertheless, the court held this evidence legally insufficient to establish depraved indifference because:

> Although [he] drove on the wrong side of the road, this conduct was episodic and part of his effort to avoid other vehicles while evading the police. This conscious avoidance of risk is the antithesis of a complete disregard for the safety of others. Defendant was unquestionably reckless, but he was not depravedly indifferent as we have defined and interpreted that state of mind. [...] [W]e conclude that, given this evidence, a rational jury could not have reasonably found depraved indifference beyond a reasonable doubt.

*Maldonado*, 24 N.Y.3d at 54.

Appellant's conduct during the December 2nd incident was unquestionably very serious, but the People failed to establish that he acted with the required mental state of depraved indifference. Notably, because the People did not introduce any dash camera video, their entire case rested on the testimony of the officers. And while they said that appellant drove at high speeds, failed to signal, and crossed the double yellow lines, the officers also confirmed that appellant consciously sought to lessen the risks caused by his actions. While he crossed over to the wrong side of the road, he only did so to move around and avoid other cars, before immediately returning to the correct side. And while he clipped Bowman's car, and may have clipped a minivan, those

24

actions were entirely consistent with appellant's attempts to avoid cars. Identical to the defendant in *Maldonado*, appellant drove on the wrong side of the road for brief episodes as part of his effort to avoid other vehicles while evading the police. He thus *consciously sought to mitigate the risk* by "'actively attempt[ing] to avoid hitting other vehicles' by swerving, conduct which establishes a lack of depraved indifference." *Maldonado*, 24 N.Y.3d at 53-54 (quoting *People v. Heidgen*, 22 N.Y.3d 259, 276 (2016)).

Further, even assuming appellant intentionally hit the police car when the officers initially attempted to box him in, this specific conduct was insufficient to establish that he acted with depraved indifference. By the police officers' own account, appellant was accelerating from a near stop as he inched forward to make a turn and the police cars were very close to him (Hoxha: 282-83; Rentas: 381-82: Podaras: 459). The damage to the police vehicle was thus consistent with a fender bender and certainly did evince "utter disregard for the value of human life." *Feingold*, 7 N.Y.3d at 296; *see People v. Jackson*, 126 A.D.3d 1508 (4th Dept. 2015) (evidence that defendant led police on high-speed chase, interfered with traffic, exceeded speed limit, and ran red lights and stop signs before crashing his car, without more, was legally insufficient to establish reckless endangerment in the first degree).

Finally, it is undisputed that no one was injured. Even when the defendant's conduct results in injuries or even death, that is insufficient to prove the defendant acted with the mental state of depraved indifference. *See, e.g., Maldonado*, 24 N.Y.3d 48 (despite driver's actions resulting in death of a pedestrian, insufficient evidence to

25

establish driver acted with depraved indifference); *see also People v. Prindle*, 16 N.Y.3d 768 (2011) (same, when defendant led police on high speed chase, ran at least five red lights, and crossed into traffic on other side of road, resulting in death of another motorist); *People v. Scarlett*, 132 A.D.3d 473 (1st Dept. 2015) (same, when even though defendant purposefully failed to take anti-seizure medication, concealed history of epilepsy to obtain commercial driver's license, and drove commercial sanitation truck into Manhattan, resulting in the death of two pedestrians).  Just as the Court of Appeals found in *Maldonado*, appellant's conduct here was "unquestionably reckless," but did not evince depraved indifference.

Conversely, the Court of Appeals and this court have found that depraved indifference was established only when the defendant made absolutely no attempt to avoid hitting other vehicles.  *See Heidgen*, 22 N.Y.3d at 267 (three defendants drove a significant distance in the wrong direction and did not swerve to avoid other vehicles); *People v. Taylor*, 22 N.Y.3d 259, 271-72 (2013) (defendant sped without headlights on the wrong side of the road and made no attempt to swerve); *People v. McPherson*, 22 N.Y.3d 259, 273 (2013) (defendant travelled 5 miles in the wrong direction and made no attempt to brake or avoid other vehicles); *People v. Williams*, 150 A.D.3d 1273 (2d Dept. 2017) (defendant was drunk and high, there was no evidence he made any effort to slow down or avoid hitting another vehicle, and he hit another car at such a high speed that the car broke in half, killing a man).  Since the facts here are easily distinguishable, they failed to prove depraved indifference.

This issue is preserved because defense counsel moved to dismiss the first degree reckless endangerment charge as legally insufficient, arguing that the People failed to establish that appellant had acted with depraved indifference, just as appellant now argues on appeal (504-05, 695).  The court's denial of defense counsel's motion further preserved the issue.  *See* C.P.L. § 470.05(2); *People v. Prado*, 4 N.Y.3d 725, 726 (2004).

Accordingly, the evidence was legally insufficient to establish that appellant acted with depraved indifference and the People failed to prove reckless endangerment in the first degree beyond a reasonable doubt. Appellant's conviction for that count should thus be reversed and that count of the indictment dismissed.  U.S. Const., Amend. XIV; N.Y. Const., Art. I, § 6; *Jackson*, 443 U.S. at 313–320; *In re Winship*, 397 U.S. at 364; *Santos*, 38 N.Y.2d at 175.

POINT II

APPELLANT WAS DENIED DUE PROCESS AND
THE RIGHT TO TESTIFY BY THE COURT'S
*SANDOVAL* RULING WHICH ALLOWED THE
PEOPLE TO ELICIT THAT HE HAD PREVIOUSLY
BEEN CONVICTED OF ATTEMPTED RECKLESS
ENDANGERMENT DURING AN INCIDENT WHEN
HE ALLEGEDLY DROVE A CAR DURING A POLICE
CHASE – FACTS IDENTICAL TO THE CURRENT
OFFENSE.

Under the court's *Sandoval* ruling, if appellant testified at trial, the prosecutor

could elicit that he had previously been convicted of attempted reckless endangerment

as well as the underlying facts of that conviction. Not only was this prior conviction

irrelevant to appellant's credibility, but informing the jurors of it would have inevitably

led them to conclude that appellant had a propensity for the exact crimes for which he

was on trial.  Moreover, since the People's case rested entirely on officer testimony as

to what happened and appellant's *mens rea* at the time was a critical element of the

reckless endangerment charges, it was imperative that he testify to provide his account

of the events.  The court's *Sandoval* ruling, essentially barring appellant from doing so,

deprived him of his due process right to a fair trial.  *See* U.S. Const., Amends. VI, XIV;

N.Y. Const., Art. I, § 6.

Evidence of prior convictions poses the substantial risk that the defendant's

presumption of innocence will be ignored "solely because of a jury's natural tendency

to conclude, despite limiting instructions, that a defendant who has committed previous

crimes is either the kind of person likely to have committed the crime charged or is

deserving of punishment in any event." *People v. Davis*, 44 N.Y.2d 269, 274 (1978); *see also People v. Walker*, 83 N.Y.2d 455, 463 (1994); *People v. Mayrant,* 43 N.Y.2d 236, 239 (1977).  The only legitimate purpose of questioning a defendant about prior crimes is challenging the credibility, veracity, or honesty of his testimony.  *People v. Sandoval*, 34 N.Y.2d 371, 376 (1974).  Before allowing cross-examination about a defendant's criminal record, therefore, a trial court must balance the probative worth of the prior crimes on the issue of credibility against the risk of unfair prejudice to the defendant.  *Sandoval*, 34 N.Y.2d at 376.  This balancing requires a "sensitive, informed reconciliation of the interests of the People and the rights of the defendant."  *Id.*; *see People v. Williams*, 56 N.Y.2d 236, 238-239 (1982);  *People v. Mitchell*, 209 A.D.2d 443 (2d Dept. 1994).

Notably, the trial court must consider whether the particular circumstances of the case would impermissibly and unavoidably lead a jury to convict because of an assumption of criminal propensity.  Failure to adequately protect a defendant in this regard, when the crime the defendant faces at trial is identical or similar to the prior conviction, warrants reversal.  *See Williams*, 56 N.Y.2d at 239; *see also People v. Dickman*, 42 N.Y.2d 294, 297-98 (1977) (error to allow cross-examination on similar prior conviction in reckless endangerment case); *People v. Calderon*, 146 A.D.3d 967, 970-71 (2d Dept. 2017) (error to allow cross-examination on prior conviction with similar facts); *People v. Rivera*, 216 A.D.2d 221, 221-22 (1st Dept. 1995) (reversal for allowing inquiry into prior crime occurring at virtually the same location as charged crime); *People*

29

*v. Coe*, 95 A.D.2d 685, 686 (1st Dept. 1983) (similarity of previous crimes as a factor to

be considered is a "well-established and since restated rule").

Preliminarily, the trial court here abdicated its responsibility to identify and

balance the relevant factors by failing to make any record of which factors it was

considering and how they weighed against each other.  The court simply stated:

> I do realize that there is a similarity between [the attempted
> reckless endangerment conviction] and the facts before the
> Court now. I do realize that there is a similarity and by review
> of the cases on this issue say that that similarity in and of
> itself is not a reason to exclude it. So it's still the Court's
> discretion even though it is similar to the acts here.  And I
> believe I am going to permit it on that ground (32).

Thus, while the court paid lip service to the *Sandoval* principle, it engaged in "abuse or

nonexercise of discretion" by failing to attempt to weigh the probative worth of the

underlying fact evidence on the one hand, with the risk of unfair prejudice to appellant

on the other.  *Williams*, 56 N.Y. at 240.

Further, by allowing the People to question appellant about the underlying facts

of the attempted reckless endangerment conviction, the court failed to adequately

protect him from their overwhelming prejudice.  The court never invoked the concept

of balancing or the risk of prejudice to appellant.  It merely stated that the similarity

between the attempted reckless endangerment charge and the current offense was not

dispositive, without recognizing any other factors.  Thus, the court only took into

account the interests of the People, and not the contrasting interests of appellant. *See*

*Williams*, 56 N.Y.2d at 239-40 ("The record of the Sandoval hearing gives no indication

that the court engaged in any exercise of its discretionary power to weigh the various relevant factors. Indeed, the only factor it appeared to consider was whether the prior convictions indicated defendant's willingness to place his own interests above those of society."); *cf. People v. Smith*, 59 N.Y.2d 156, 167-68 (1983) (trial court properly exercised its discretion because it specifically stated that it had "considered the prejudicial effect" that the evidence of the defendant's prior convictions would have on the defendant). Therefore, the trial court abdicated its responsibility and abused its discretion in allowing the prosecutor to elicit evidence both of appellant's prior conviction for attempted reckless endangerment as well as the underlying facts.

The court's failure to balance the factors was clearly erroneous and especially prejudicial in this case as the facts of appellant's prior conviction were nearly identical to the current offenses. The ruling clearly prevented appellant from exercising his right to testify in his defense, since admitting evidence of a prior reckless endangerment conviction would have been fatal to any defense, conveying to the jury appellant's propensity for such conduct, and likely dispositive as to the counts of reckless endangerment in the first degree. Establishing that appellant had acted recklessly and in a manner evincing "depraved indifference to human life" was essential to the charge of reckless endangerment in the first degree. Consequently, appellant's own testimony of his mindset, the events as he perceived them, and his understanding of the riskiness of his conduct, would have been vital to the defense and material to the jury's consideration of the evidence as a whole. *See People v. Grant*, 7 N.Y.3d 421, 425 (2006)

(harmlessness of erroneous *Sandoval* ruling turns on whether defendant's decision not to testify deprived the jury of "any critical information"); *accord Williams*, 56 N.Y.2d at 241; *Calderon*, 146 A.D.3d at 971 (erroneous *Sandoval* ruling not harmless when proof of defendant's guilt not overwhelming and he was the "only available source of material testimony in support of his defense").

Because defense counsel argued that the prior conviction was prejudicial and that if the People were permitted to inquire, it would have a chilling effect on appellant's ability to testify, this issue is fully preserved for appeal (H. 15).  *See* C.P.L. § 470.05(2). Accordingly, this Court should reverse appellant's conviction and remand for a new trial.


## POINT III

THE COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WHEN IT ADMITTED IRRELEVANT AND EXTREMELY PREJUDICIAL TESTIMONY THAT THE OFF-DUTY POLICE OFFICER WHOSE CAR WAS HIT WAS PREGNANT.

Over defense counsel's objection, the trial court allowed the prosecutor to elicit testimony that Officer Stephanie Bowman was eight months pregnant when her car was allegedly hit by appellant, and further allowed the prosecutor to comment during opening statements that Bowman went to the hospital after the incident, despite absolutely no allegations that she was injured.  Not only was this testimony and argument entirely

irrelevant to the case, but it was highly prejudicial, especially because the People repeatedly stressed Bowman's pregnancy during summation.  Admission of this testimony was thus in error and denied appellant his due process right to a fair trial.  U.S. Const., Amend. V, XIV; N.Y. Const., Art. 1, § 6; *Berger v. United States*, 295 U.S. 78, 88-89 (1935).

Although determinations weighing the probative value against the prejudicial value of evidence rest "within the trial court's discretion" and are reviewed "in light of the facts and circumstances of each case," *People v. Torres*, 45 A.D.3d 1054 (3d Dept. 2007); *see People v. Primo*, 96 N.Y.2d 351 (2001), "[a] defendant is entitled to have his guilt or innocence determined solely upon the evidence tending to prove the crime charged, uninfluenced by irrelevant and prejudicial facts and circumstances." *People v. Blanchard*, 83 A.D.2d 905, 905 (2d Dept. 1981); *see People v. Cook*, 42 N.Y.2d 204, 208 (1977).

Appellate courts have repeatedly held that it is error to admit irrelevant facts about the victim or the witness testifying, as such testimony tends only to elicit sympathy for that person and antipathy towards the defendant.  *See, e.g., People v. Miller*, 6 N.Y.2d 152, 157 (1959) (reversal warranted as testimony that decedent had wife and seven children "had no bearing on the materiality of the issues before the jury, was calculated to appeal to the passion and sympathy of the jury and, hence, unduly prejudiced the defendant"); *People v. Redd*, 141 A.D.3d 546, 551 (2d Dept. 2016) (trial court erred in permitting People to elicit evidence of victim's personal and family life which "was not probative of any issue to be determined at trial and was prejudicial to the defendant"); *People v. Walters*, 251 A.D.2d 433 (2d Dept. 1998) (prosecutor's inflammatory, unnecessary, and improper remarks included

invitation to jury to "imagine what a shock it was to [the victim's wife], who's eight months pregnant").

Here, not only was information regarding Bowman's pregnancy entirely irrelevant, but it was extremely inflammatory. Testimony that Officer Bowman was pregnant at the time of the incident served no purpose other than to appeal to jurors' passion and sympathy, and engender prejudice against appellant. The court's decision, over defense counsel objection, to allow testimony that Bowman was pregnant and went to the hospital after the incident was thus clear error. And, this erroneous ruling allowed the prosecutor to bring up the fact that Bowman was pregnant and went to the hospital in his opening statement, allowed Bowman to testify that she was pregnant at the time of the incident, and permitted the prosecutor to repeatedly remind the jury during closing arguments that Bowman had been pregnant. Indeed, the prosecutor referred to her specifically as "pregnant Stephanie Bowman" during closing, cementing this image in the jurors' eyes just before they went to deliberate.

The inclusion of these irrelevant and inflammatory facts, an issue fully preserved for this Court's review, was not harmless. *People v. Crimmins*, 36 N.Y.2d 230, 241-43 (1975). This evidence was clearly intended to garner sympathy for Bowman and bolster her testimony that appellant hit her car – testimony that was crucial to many of the charges against him. Indeed, that the jury acquitted appellant of reckless endangerment in the first degree for the November 28th incident, which involved substantially similar conduct, while convicting him of reckless endangerment in the first degree for the incident involving

34

Officer Bowman, suggests that this evidence bore heavily on its consideration of the December 2nd incident.   In fact, the jury specifically requested information regarding Bowman during its deliberations.   Not only did the jury ask for readback of nearly all of her testimony, but it requested a copy of the "accident report" relating to her (673-78). The jurors' false belief that there was an "accident report" related to Officer Bowman, when in fact there was not (679-82), suggests that they believed she was injured, as the People had implied in their opening statement.   Thus, the jury clearly focused intently on Bowman's testimony while coming to a verdict – testimony that was made much more sympathetic by the many references to her pregnancy.

This irrelevant and prejudicial testimony clearly garnered sympathy for the witness and antipathy towards appellant.   In a highly fact-specific case such as this, where the entire context and circumstances of events were necessary to establish each charge against appellant, the error deprived appellant of his due process right to a fair trial.   This Court should reverse appellant's convictions and remand for a new trial.   U.S. Const., Amend. XIV; N.Y. Const., Art. 1, § 6; *Berger*, 295 U.S. at 88-89.

POINT IV

THE TRIAL COURT VIOLATED APPELLANT'S DUE PROCESS RIGHT TO A FAIR TRIAL WHEN IT GAVE NUMEROUS UNNECESSARY INSTRUCTIONS TO THE JURY THAT AFFIRMATIVELY MISSTATED WITNESS TESTIMONY, SIGNIFICANTLY UNDERMINED THE DEFENSE, AND HIGHLIGHTED EVIDENCE PREJUDICIAL TO APPELLANT.

At crucial moments throughout the trial, the trial judge unnecessarily interfered in the judicial process by affirmatively misstating witness testimony, undermining the defense summation, and drawing the jury's attention to prejudicial evidence against appellant during the People's closing.  The combined effect of these errors was to confuse the jury, telegraph that the court supported the prosecution's view of the case, and highlight evidence the inculpated appellant.  This deprived appellant of his due process right to a fair trial.  *See* U.S. Const., Amends. V, XIV; N.Y. Const., Art. 1, § 6.

The right to a jury trial includes the right to jury deliberations not "intruded upon by outside" influences, including those exerted by the court.  *People v. Rodriguez*, 71 N.Y.2d 214, 218 n.1 (1988).  The trial judge must employ "caution," *People v. Mendes*, 3 N.Y.2d 120, 123 (1957), and "judicious restraint," *People v. Moulton*, 43 N.Y.2d 944, 945 (1978), in order to avoid "[u]nnecessary and excessive interference in the presentation of proof," *People v. DeJesus*, 42 N.Y.2d 519, 524 (1977).  It is paramount that the judge "be scrupulously free from and above even the appearance or taint of partiality." *DeJesus*, 42 N.Y.2d at 524.  Thus, a trial court may not influence the jury to render a particular verdict by telegraphing its view of the evidence to the jury.  *See DeJesus*, 42 N.Y.2d at 523-24 ("Since the presence of the Judge is likely to be equated with the majesty of the law itself, [ ] 'care must be taken to guard against an opinion that might be seized upon by the jury and eventually prove decisive'" (internal quotation marks omitted)); *see also People v. Yut Wai Tom*, 53 N.Y.2d 48, 56-61 (1981); *People v. Mees*, 47 N.Y.2d 997, 998 (1979).

36

Here, the trial court's various unnecessary instructions improperly drew the jury's attention to material that was prejudicial to the defendant, and suggested to the jurors that the court was partial to the People's view of the evidence. First, the trial court affirmatively misstated testimony to the benefit of the prosecution. Prior to Hoxha and Rentas testifying about the minivan, the parties agreed that the judge would give an instruction that appellant was not separately charged with a crime regarding the minivan, and that the purpose of any testimony about it was merely to provide context to the incident (270-74). Thus, when Officer Hoxha testified that appellant hit the minivan, the judge gave an instruction limiting its use (331). When his partner, Officer Rentas took the stand, however, he *did not* testify that the minivan was struck, saying only that he observed its brake lights (Rentas: 410). Nevertheless, the court immediately interjected:

> Again, members of the jury, I just want to remind you similarly what happened with the other witness. [Appellant] is not charged separately with anything or it's not alleged that he's charged with any crimes solely *by hitting this silver minivan as was testified here.* I'm just permitting this for the sole purpose of the continuity of events, if you will, so that the testimony, there's no gaps in it and it makes sense to you. Again I'll just remind you that he's not accused of or charged with *hitting this minivan as with regard to the testimony you heard* (410)(emphasis added).

This was a clear and affirmative misstatement of Rentas's testimony. Rentas said only that he saw the minivan's brake lights, yet the court *twice* stated that he had testified that appellant hit the minivan, specifically using the phrases, "as was testified here," and

"with regard to the testimony you heard."  A very likely consequence is that the jury, upon hearing and reflecting on the judge's instruction, concluded that Rentas had said that appellant hit the minivan, contrary to Rentas's actual testimony.  But, even if the jurors remembered Rentas's statement, the court's instruction conveyed to them that it believed Hoxha's version of events (that the minivan was hit) over Rentas's, thus evincing bias and violating appellant's right to a fair trial.  *See United States v. Filiani*, 74 F.3d 378, 385-87 (2d Cir. 1996) (a court may not "give the jury the impression of partisanship or foster the notion that it believes one version of an event and not another").

Second, the trial court excessively and unnecessarily interfered when it gave an instruction completely undermining a significant portion of the defense's summation immediately before the prosecution closed.  After the defense summation, the prosecution objected to comments suggesting that appellant was afraid during the incidents because he did not know the people pursuing him were police officers and could have believed it was an attempted robbery or carjacking, arguing that was not a defense to the charge of leaving the scene of an accident (569-71).  The parties agreed in response that the court would instruct the jury after the People's summation and prior to deliberations that this was not a defense to that charge (571).

However, the court later reversed itself, insisting that it had to instruct the jury immediately rather than during the charge (583).  Over defense counsel's objection, the court then loosely and somewhat awkwardly paraphrased the defense summation,

38

before stating: "But to the extent that you understood [defense counsel's] argument to mean at that time the driver of the vehicle didn't stop because of some possible fear for his safety, unknown persons were following him in a car he didn't recognize and things of that nature, that's not a defense to it" (590-91).

Although the prosecutor's objection was that a "reasonable fear" is not a defense to leaving the scene of an accident, the court's instruction, "that's not a defense *to it*," was far less specific and was in no way clear that the court was only addressing that one specific charge.   Consequently, the jury may well have understood that what appellant thought was happening and whether he knew that the police were attempting to stop him were entirely irrelevant to *all* of the charges.  Such a misunderstanding was fatal to the defense.  What appellant perceived and what his state of mind was at the time of the offense *was* highly relevant to some of the charges he faced, most especially, the depraved indifference element for reckless endangerment in the first degree.  Further, the court's insistence on delivering the instruction immediately following the defense summation, rather than later during its charge, resulted in the court discrediting a significant portion of the defense's narrative directly before the prosecution offered its own.  Once again, this suggested to the jury that the court favored the People's view of the evidence.

Finally, the court again unnecessarily interfered by spontaneously and intentionally drawing the jury's attention to the police department logo on the I-card.  Defense counsel had objected to any display of the I-card during the People's

summation, arguing that it was highly prejudicial because the presence of appellant's mug shot would suggest to the jury that he had previously been arrested (532). The court overruled the objection and allowed the I-card to be shown with appellant's mug shot, and defense counsel did not request an instruction nor did the court mention giving one (534). Nevertheless, when the People displayed the I-card and mentioned the photo, the court interrupted, pointed out the police department logo to the jury, and stated:

> The fact that [there is a logo] is not evidence that [appellant] or the person indicated has any propensity to commit a crime or predisposed to commit a crime. It's permitted for the limited purpose of showing the basis of the identification that the witness who saw that made and for that purpose only (594).

Not only was giving a limiting instruction never discussed with the parties, but it is very likely that, if the court had offered one, defense counsel would have declined it because it served only to highlight the prejudicial information. Even worse, telling the jury *not* to consider the I-card as proof of appellant's criminal propensity only *increased* the likelihood that the jury would do just that and wonder whether appellant had previously been arrested. *Cf. United States v. Antonetti Fireworks Co.*, 155 F.2d 631, 656 (2d Cir. 1946) (French, J., dissenting) ("the judge's cautionary instruction may do more harm than good … [by] emphasiz[ing] the jury's awareness of the censured remarks"); *United States v. Davis*, 904 F. Supp. 546, 569 n. 3 (E.D. La. 1995) ("When one is told, 'Don't think about elephants,' the immediate image in the mind is of an elephant. So

goes the effectiveness of instructions to disregard"); *see also People v. Henderson,* 169 A.D.2d 647, 650 (1st Dept. 1991) (reversal warranted when court's statements highlighted specific information which it had earlier excluded as prejudicial and "[t]hus, the jury was advised by the court itself that defendant and his brother were engaged in selling drugs rather than by the district attorney, defense counsel or one of the witnesses").

These errors are preserved for the court's review.  Defense counsel objected to the inclusion of any testimony regarding the minivan; objected to the court's instruction immediately after the defense summation and proposed that the court give it instead during its charge, which the court rejected; and objected to any display of the I-card.  *See* C.P.L. § 470.05(2); *People v. Prado*, 4 N.Y.3d 725, 726 (2004). To the extent that this claim is unpreserved, this Court should reach it in the interests of justice or, alternatively, find that defense counsel was ineffective for failing to adequately preserve it.  The claim that the intrusion of the trial judge deprived appellant of his constitutional right to a fair trial is not subject to harmless error analysis.  *See People v. Robinson*, 151 A.D.3d 758, 762 (2d Dept. 2017); *Mees*, 47 N.Y.2d at 998; *People v. Crimmins*, 36 N.Y.2d 230, 238 (1975).

The trial judge's unnecessary interference at critical points during the trial misstated crucial testimony, signaled that the judge believed the prosecution's version of events, undermined the defense's theory of events, and highlighted prejudicial evidence against appellant.  Because these errors deprived appellant of his due process

41

right to a fair trial, this Court should reverse appellant's convictions and remand for a new trial.  *See* U.S. Const., Amends. V, XIV; N.Y. Const., Art. 1, § 6.

<u>CONCLUSION</u>

FOR THE REASONS STATED IN POINT I, APPELLANT'S CONVICTION FOR RECKLESS ENDANGERMENT IN THE FIRST DEGREE SHOULD BE REVERSED AND THAT COUNT OF THE INDICTMENT DISMISSED; ALTERNATIVELY, FOR THE REASONS STATED IN POINTS II, III, AND IV, APPELLANT'S CONVICTION ON ALL COUNTS SHOULD BE REVERSED AND THE CASE REMANDED FOR A NEW TRIAL.

Respectfully Submitted,

LYNN W. L. FAHEY
Attorney for the Defendant-Appellant

REBECCA J. GANNON
Of Counsel
September 2017

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION:  SECOND DEPARTMENT
---------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,    :

                    Respondent,       :       Richmond County
                                                Ind. No. 31/16
          -against-          :

BRIAN CHAMBERS,           :       A.D. No. 16-09813

           Defendant-Appellant.      :

---------------------------------------------------------------------x

## **CERTIFICATE OF COMPLIANCE**

The foregoing brief was prepared on a computer.  A proportionally spaced typeface was used, as follows:

Name of typeface: Garamond

Point size: 14

Line spacing: double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, proof of service and this certificate of compliance is: 10,721.

Date: September 28, 2017

_____
Rebecca J. Gannon