UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRIAN CHAMBERS, | Petitioner, | 20-CV-03429 (ERK) |
| -against- | | **AFFIRMATION IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS** |
| ANTHONY J. ANNUCCI, | Respondent. | |

**ALEXANDER FUMELLI**, being an attorney duly admitted to practice before the Eastern District of New York, hereby affirms, under penalty of perjury, that the following statements are true:

1. I am a duly appointed Assistant District Attorney in and for the County of Richmond, State of New York. Having reviewed the post-conviction litigation had under this indictment, I am wholly familiar with the papers and records on file in the Richmond County District Attorney's Office.

2. Pursuant to an August 22, 2016, judgment in Richmond County Supreme Court, petitioner was convicted of Reckless Endangerment in the First Degree [P. L. § 120.25], among other offenses,[1] and sentenced as a second felony offender to three to six years' imprisonment. He is presently on parole.

---

[1] Defendant was also convicted of Reckless Endangerment in the Second Degree [P. L. § 120.20], two counts of Reckless Driving [V. T. L. § 1212], two counts of Obstruction of Governmental Administration in the Second Degree [P. L. § 195.05], three counts of Criminal Mischief in the Fourth Degree [P. L. § 145.00(3)], and three counts of Leaving the Scene of an Incident Without Reporting [V. T. L. § 600(1)(a)]. On the second-degree reckless endangerment count, he was sentenced to a consecutive year of imprisonment; on the remaining counts, he received lesser

1

3. To convict a defendant of first-degree reckless endangerment, the Penal Law requires that, "under circumstances evincing a depraved indifference to human life," a defendant "recklessly engage[] in conduct which creates a grave risk of death to another person." P. L. § 120.25. Here, the evidence supporting petitioner's "depraved indifference" showed that, from behind the wheel, he had led police on a five-and-a-half-mile nighttime chase down city streets, including a 16-block chase along the painted yellow median of a two-way street in heavy traffic. Moreover, petitioner had struck a police vehicle, driven through stop signs and red lights at dangerously excessive speeds, repeatedly driven in the opposing lane of travel, sideswiped two moving vehicles, and caused pedestrians and other automobiles to leave the road to avoid being struck.

4. On January 30, 2019, over claims that the evidence had been insufficient to support petitioner's "depraved indifference," the Appellate Division, Second Department, affirmed the judgment. On May 3, 2019, after considering the same argument in petitioner's leave application, the New York Court of Appeals denied leave to appeal.

5. Now, by his instant petition for a writ of habeas corpus, petitioner seeks release from custody because, in his view, his state conviction "involved an unreasonable application of clearly established law, as determined by the Supreme Court." 28 U. S. C. § 2254(d). That purported "unreasonable application" was precisely the one petitioner had identified below: that he had been convicted upon insufficient evidence. See Jackson v. Virginia, 443 U.S. 307, 309 (1979).

---

concurrent sentences.

6.   Owing to the procedural history described above, petitioner's claim is properly exhausted. But because Jackson, 443 U.S. 307, commands that a habeas writ be denied where "there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt," id. at 313, this petition must meet with the same result. Indeed, there was no shortage of evidence supporting defendant's conviction of first-degree reckless endangerment.

The Evidence at Trial

*The People's Case*

7.   On November 28, 2015, at about 8:35 p.m., a man later identified as defendant drove his Honda CR-V from Canal Street onto Broad Street in Staten Island (Truscelli 101). As he did so, he failed to use his right turning signal (Truscelli 101; People's Exhibit 4 [photograph]). He then turned left onto Gordon Street and double-parked next to a row of cars on the right side of the street (Truscelli 103; Kinsella 216).

8.   Detective ARTHUR TRUSCELLI and Sergeant ANDREW KINSELLA, conducting street enforcement from an unmarked black Mazda three or four car lengths behind, followed defendant as he drove (Truscelli 50, 52, 101, 103; Kinsella 206, 211). They were to be aided by Detective CLYDE MOYER and Detective David Luppino, both in an unmarked Dodge minivan.

9.   Because of the traffic violation, Truscelli and Kinsella planned to conduct a "tactical car stop" by which two police cars would surround defendant's vehicle – one in front, and one in the back – and block it in (Truscelli 105, 106; Moyer 168, 172; Kinsella 216).

3

10. Detective Truscelli, traveling at approximately five miles per hour, pulled his Mazda in front of defendant's car, but at an angle; there were six or seven feet between the Mazda and the line of cars parked immediately to its right (Truscelli 107; Kinsella 220). Meanwhile, Detective Moyer parked behind defendant's car at a similar angle, and activated his car's flashing lights (Truscelli 109; Moyer 170).

11. As Sergeant Kinsella began to step out from the front vehicle's passenger door, defendant's car revved its engine and sped through the small space between Kinsella's car and the adjacent parked cars (Truscelli 109; Kinsella 222). Kinsella jumped back into his car (Truscelli 109). His open door was knocked all the way forward from the impact of defendant's passing car, and the Mazda shook (Truscelli 109, 110).

12. Detective Truscelli and Sergeant Kinsella pursued defendant. With Kinsella holding onto the car door to keep it from flapping into traffic, and Truscelli holding onto Kinsella by his arm, the detectives drove at 50 miles per hour to follow defendant, who was traveling at about the same speed or faster (Truscelli 111, 113, 114; Moyer 175; Kinsella 223).

13. Defendant turned right from Gordon Street onto Laurel Avenue, tapping on his brakes and accelerating through a stop sign without using his turn signal (Truscelli 114). Next, he turned right from Laurel Avenue onto Targee Street, a street with pedestrians, again failing to fully brake or to use his turn signal (Truscelli 118; Kinsella 227, 229). Defendant accelerated to about 50 or 60 miles per hour and drove through a red light on Targee Street, where the posted speed limit was 25 miles per hour (Truscelli 119, 120; Kinsella 229, 230; People's Exhibit 8

[photograph]). This prompted a car entering the intersection with a green light to slam on its brakes (Truscelli 120).

14.    Truscelli and Kinsella had followed defendant, with flashing lights activated, through Gordon Street, Laurel Avenue, and Targee Street – but now abandoned their pursuit, adjudging it too dangerous to continue (Truscelli 122).

15.    Detective Truscelli prepared an "I-Card," a database entry that flags an individual's pedigree information in police records (T. 127-28; People's Exhibit 13 [I-Card]). "That way if they are ever stopped for whatever other reason, traffic infraction, summons," Truscelli explained, "when the name is run . . . it pops up that they are wanted . . . for questioning or arrest in regards to something separate" (T. 128).

16.    Four days later, on December 2, 2015, at about 7:15 p.m., Officers NICHOLAS RENTAS, MIREL HOXHA, and NICHOLAS PODARAS and Sergeant Andrew Kinsella, all in unmarked cars, responded to 85 Notre Dame Avenue in Staten Island pursuant to that I-Card (Hoxha 255). They watched defendant enter a dark gray Mazda, parked next to a Honda CR-V in front of 85 Notre Dame Avenue in Staten Island (Hoxha 276, 280; Rentas 378). Defendant drove the car toward the intersection of Notre Dame Avenue and Lamoka Avenue (Hoxha 277, 282; Rentas 379).

17.    The officers attempted to execute another tactical car stop. Rentas, driving with Hoxha in the front passenger seat of an unmarked Chevrolet Impala,

5

made a turn that left them face-to-face with defendant, blocking the front of his Mazda (Hoxha 284; Rentas 382).

18. Defendant hit the Impala head-on, then continued to accelerate, scraping the Impala's front bumper with the left side of his own front bumper; the Impala was later discovered to have a broken passenger-side headlight and a misaligned undercarriage and bumper (Hoxha 286, 341; Rentas 383; People's Exhibit 34 [photograph]). Defendant drove past the Impala, turned right onto Lamoka Avenue at a high rate of speed (Hoxha 283, 287; Rentas 385; People's Exhibit 17 [photograph]), and continued for two blocks before turning left onto Brookfield Avenue, a residential street (Hoxha 289, 297; Rentas 386; People's Exhibit 15 [map]). Rentas and Hoxha followed him, lights and sirens engaged (Hoxha 290; Rentas 386).

19. At the intersection of Brookfield Avenue and Katan Avenue, defendant drove through a stop sign without braking (Hoxha 290; Rentas 387). At a speed of about 40 to 50 miles per hour, he drove through stop signs at the next three intersections: Genesee Avenue, Leverett Avenue, and Barlow Avenue. He did not brake at all as he crossed Leverett and Barlow (Hoxha 292, 293; Rentas 388, 389).

20. When defendant reached the intersection of Brookfield and Arthur Kill Road, he went through a stop sign and turned right without signaling, prompting a car traveling on Arthur Kill Road – a mixed-use street – to stop short in the middle of the intersection, and its tires to screech (Hoxha 296-97). Defendant continued for approximately five blocks before arriving at the intersection of Arthur Kill Road and Giffords Lane, where the light had just turned green and a line of ten to 15 stopped

cars awaited him (Hoxha 298; People's Exhibit 15 [map]). Meanwhile, five to seven cars in the opposite lane of traffic were about to cross the intersection toward defendant (Hoxha 299). At a speed between 35 and 50 miles per hour, defendant went around the left side of the stopped cars, crossing a double yellow line and entering the opposite lane of traffic before crossing the intersection (Hoxha 299, 300; Rentas 392).

21. About 11 blocks further, defendant reached the intersection of Arthur Kill Road and Clarke Avenue (Hoxha 301; People's Exhibit 15 [map]). Again, cars were stopped in front of him – about ten in the left lane, waiting for the light to change before traveling straight through the intersection; and ten in the right lane, slowly proceeding through right turns with the permission of a green traffic arrow (Hoxha 302). At a speed of 40 or 45 miles per hour, defendant again crossed a double yellow line and entered the opposite lane of traffic, prompting an oncoming car to swerve out of his way and into the curb (Hoxha 302, 303; People's Exhibit 25 [photograph]).

22. About two blocks further, defendant reached the intersection of Arthur Kill Road and mixed-use Richmond Road (Hoxha 308). Defendant slowed to a stop and turned right onto Richmond Road, failing to signal (Hoxha 305; People's Exhibit 15 [map]). Officer Rentas rear-ended him (Rentas 396, 401). Defendant continued driving (Rentas 401).

23. About five blocks further, defendant reached the intersection of Richmond Road and Lighthouse Avenue (People's Exhibit 15 [map]). Yet again, cars were stopped in front of defendant at a red light (Hoxha 306). Yet again,

7

defendant crossed a double yellow line and entered the opposite lane of traffic, returning to his lane as he crossed the intersection (Hoxha 307). At this point, defendant was driving between 50 and 60 miles per hour (Hoxha 308; Rentas 403).

24. Defendant continued on Richmond Road, passing any slowed or stopped cars in front of him by crossing the double yellow line (Hoxha 308). He did this three or four times over a span of about 20 somewhat winding blocks, including through a red light (Hoxha 309; Rentas 401; People's Exhibit 15 [map]). When defendant reached the intersection of Richmond Road and Amboy Road, he used the right turning lane to turn left onto Amboy Road, cutting off a driver in the left turning lane (Rentas 405).

25. When defendant arrived at the intersection of Amboy Road and New Dorp Lane, two lanes of cars were stopped at a red light (Hoxha 312). Defendant opted for the right lane, which contained fewer cars (Hoxha 312). As defendant slowed down, Officers Rentas and Hoxha pulled up behind him (Hoxha 313). Defendant then maneuvered his car between two cars in the left lane, across the double yellow line, and through the intersection (Rentas 393). This forced three or four pedestrians stepping into a crosswalk to jump back onto the sidewalk, and an oncoming car to drive onto the sidewalk (Hoxha 313, 315; People's Exhibit 30 [photograph]). A tractor-trailer's horn blared (Rentas 408). At this point, defendant was traveling at approximately 45 or 50 miles per hour (Hoxha 316).

26. Defendant continued his pattern of passing any slowed or stopped cars by crossing the double yellow line "a couple of times" over the next nine blocks (Hoxha 318; People's Exhibit 15 [map]). At the intersection of Amboy Road and

8

winding, residential Todt Hill Road, he crossed the double yellow line and turned left through a red light without signaling (Hoxha 319, 322; Rentas 408). Along Todt Hill Road, meanwhile, after continuing to cross the double yellow line to pass cars, he began driving up the middle of the street, "parting the sea" as cars on both sides swerved out of the way (Hoxha 321, 330; Bowman 482). Now, defendant was traveling between 40 and 50, or between 45 or 50, miles per hour (Hoxha 323; Bowman 484).

27. One of those swerving cars, a minivan, was sideswiped by defendant (Hoxha 330). It nearly fishtailed into Rentas and Hoxha's vehicle, prompting Hoxha to grab the roof of the car so as to brace for impact, before it regained control (Hoxha 330, 332; Rentas 411).

28. Defendant continued to drive on and across the double yellow line (Hoxha 333). At Four Comers Road, he drove through a red light and sideswiped the left side of a Ford Explorer being driven by the pregnant off-duty police officer STEPHANIE BOWMAN (Rentas 412; Bowman 479, 484). She heard a loud scraping sound, and her car was knocked to the side, sustaining scratch marks all along the driver's side and a dent toward the rear (Hoxha 333, 343; Rentas 412; Bowman 485, 486; People's Exhibits 35, 36, 37 [photographs]). Defendant continued driving, at approximately 40 to 50 miles per hour (Bowman 484). By this point, defendant had traveled about 16 blocks from the intersection at Richmond Road (People's Exhibit 15 [map]).

29. Officer Hoxha, having followed defendant with flashing lights and sirens for the entire ride, contacted his supervisor by radio and told him about

defendant's maneuvers and two sideswipes (Hoxha 336). The supervisor told Hoxha to end his pursuit of defendant, and the officers complied, turning off the car's lights and sirens and driving in defendant's direction at a more conventional speed (Hoxha 337). Defendant left their field of vision at a rate of about 60 miles per hour, headed toward the Staten Island Expressway (Hoxha 337).

30. The next evening, near Colon Avenue and Arthur Kill Road in Staten Island, Officer Hoxha found defendant's Mazda 6. It had damage to its driver's side headlight, scrapes and scratches all around, and a detached passenger-side mirror (Hoxha 348). At 2:00 the next morning, he located and arrested defendant at 85 Notre Dame Avenue (Hoxha 356).

*The Defense Case*

31. Defendant presented no evidence.

<u>Why the Writ Should Be Denied</u>

32. As discussed above, a habeas petitioner cannot prevail on a claim of legally insufficient evidence unless he can show that, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. <u>Flowers v. Fisher</u>, 296 Fed. Appx. 208, 210 (2d Cir. 2008). When considering the sufficiency of the evidence of a state conviction, "[a] federal court must look to state law to determine the elements of the crime." <u>Quartararo v. Hanslmaier</u>, 186 F.3d 91, 97 (2d Cir. 1999).

33. In New York, first-degree reckless endangerment requires proof that a person, "under circumstances evincing a depraved indifference to human life, … recklessly engages in conduct which creates a grave risk of death to another person."

See P. L. § 120.25. This was precisely what petitioner did. By maintaining high speeds on traffic-congested roads for an extended period of time and, in particular, plowing through oncoming traffic by driving up the middle of one such road for 16 blocks – all while being chased by police – he endangered countless fellow drivers and, as it turns out, struck three of them. The jury was undoubtedly rational to convict him of first-degree reckless endangerment on such evidence.

34. This Court's scrutiny, to be sure, will extend beyond the mere text of the statute. The term "depraved indifference" has been the subject of repeated analysis in New York courts. It has been said to mean "an utter disregard for the value of human life." People v. Feingold, 7 N.Y.2d 288, 296 (internal quotation marks omitted). And "a depraved and utterly indifferent actor is someone who does not care if another is injured or killed." Id. (internal quotation marks and citation omitted).

35. Of course, "[a] defendant who knowingly pursues risky behavior that endangers others does not necessarily evince depraved indifference by engaging in that conduct." People v. Maldonado, 24 N.Y.3d 48, 52 (2014). As the Court of Appeals has explained, "[a] person who is depravedly indifferent is not just willing to take a grossly unreasonable risk to human life – that person does not care how the risk turns out." People v. Lewis, 17 N.Y.3d 348, 359 (2011). "The element of depraved indifference to human life comprises both depravity and indifference, and has meaning independent of recklessness and the gravity of the risk created." People v. McMillon, 31 A.D.3d 136, 139 (2d Dept. 2006), *lv. denied* 7 N.Y.3d 815 (2006). "In short, the *mens rea* of depraved indifference will rarely be established by risky behavior alone." Maldonado, 24 N.Y.3d at 53. See cf., e.g., People v. Gomez, 65 N.Y.2d 9, 10 (1985) (defendant's comment to a passenger that "I cannot put the

11

brakes on any longer" and "I have killed a person already" evinced his awareness of the grave risk).

36. Petitioner argues that the above-described evidence was legally insufficient to support the *mens rea* of "depraved indifference to human life."[2] In his view, because his conduct took place in the context of an escape from police, and because at points he attempted to evade cars in his own lane, he evinced a lesser degree of recklessness than that contemplated by the depraved-indifference *mens rea*. In other words, because he was trying to evade the police and did not embark on his "deadly game" (Maldonado, 24 N.Y.3d 48, 54 [2014]) simply for its own sake, he contends that he acted with recklessness at worst.

37. To be sure, in Maldonado, the Court of Appeals concluded that defendant Maldonado had not acted with depraved indifference because he had swerved out of the way of other vehicles in the course of his flight from police – and thus appeared to care about the consequences of his risky behavior. See also People v. Prindle, 16 N.Y.3d 768 (2011). But mere recitation to petitioner's periodic efforts to avoid collisions hardly captures the totality of his conduct. The testimony of Officers Rentas and Hoxha established that a 16-block portion of petitioner's driving did, in fact, constitute a "high speed game of chicken" (Heidgen, 22 N.Y.3d 259, 277 [2013]) during which petitioner, traveling at a speed of 40 or 50 miles per hour (Hoxha 323; Bowman 484), appeared uninterested in avoiding collisions with cars in either lane, and certainly less interested than he was in evading capture. "[T]here was oncoming traffic and going up the Todt Hill traffic he was in between the double

---

[2] Significantly, the objection is limited to the sufficiency of the evidence supporting defendant's depraved indifference; petitioner makes no argument concerning the objective gravity of the risk defendant created, or concerning other aspects of the People's proof at trial.

yellow lines, kind of like splitting up the traffic as he was going, traveling, up Todt Hill. So there w[ere] cars moving out of the way that w[ere] coming down and cars that were kind of – would be like parting the sea," Rentas testified (T. 320-21). "Basically the double yellow lines were in the middle of his vehicle and he's traveling up and there's cars to his left moving out of the way and there's cars to the right," Hoxha testified (T. 330). He was "driv[ing] in between traffic … [l]ike driving on the yellow lines because there's only two lanes," Bowman recalled (T. 482). It was during this portion of the chase that petitioner sideswiped both a minivan and Stephanie Bowman's Ford Explorer (Hoxha 330; Rentas 412). Further, the testimony concerning the intersections of Arthur Kill Road and Clarke Avenue and Amboy Road and New Dorp Lane suggests that petitioner made no effort to swerve around the pedestrians who jumped out of his way, or around the cars that were forced to swerve out of his way, as he crossed those intersections (Hoxha 302, 303, 313, 315).

38.    It cannot be seriously argued that petitioner's 16-block line drive, without any effort at evading traffic, did not evince precisely the total lack of care for consequences that is the hallmark of depraved indifference. See, e.g., People v. Feingold, 7 N.Y.3d 288, 296 (2007) ("[D]epraved indifference is best understood as an utter disregard for the value of human life – a willingness to act not because one intends harm, but because one simply doesn't care whether grievous harm results or not"); People v. Green, 104 A.D.3d 126, 129-30 (1st Dept. 2013) ("[I]t is precisely because the jury could reasonably determine that defendant was aware of the risk he was creating" in throwing objects from a 26th-floor balcony, "and did not care whether or not that risk came to fruition, that the finding that he acted with depraved indifference should be upheld."); cf. People v. Lewie, 17 N.Y.3d 348 (2011) (gravamen of depraved indifference is utter disregard for human life; since defendant

showed some concern for life of badly hurt child, she was not depravedly indifferent).

39. That this evidence of depraved indifference was based on the objective indicia of petitioner's driving patterns – and without the benefit of an admission to a witness concerning petitioner's state of mind, as in Gomez – should not alter the Court's analysis. Proof of any *mens rea* is rarely accomplished by anything other than circumstances. See People v. Barboni, 21 N.Y.3d 393 (2013); People v. Bueno, 18 N.Y.3d 160, 169 (2011). The objective circumstances surrounding a defendant's conduct, such as indicia of his driving patterns, can surely prove that defendant's depraved indifference.

40. Maldonado itself discusses a case, People v. McPherson (decided with two other cases as People v. Heidgen, 22 N.Y.3d 259 [2013]), wherein depraved indifference was established without the benefit of the defendant's reported inner monologue. Defendant McPherson, fleeing a shooting altercation at a nightclub, ignored traffic signs and drove the wrong way on the Southern State Parkway for five miles, at a speed of about 70 to 75 miles per hour, causing other cars to swerve out of his way and a Mack truck to blow its air horn. Id. at 273. He eventually crashed head-on into a Jeep, killing its driver, and was charged with depraved-indifference murder. Here, similarly, petitioner sped significantly for more than five miles, ignored traffic signs, and repeatedly caused cars to swerve out of his way. To be sure, petitioner did swerve out of the way of *some* vehicles during his 5.5-mile chase – as one would expect him to, considering that he was fleeing from police – but that fact does not excuse the periods during which he failed to do so. For 16 blocks, at a speed approximately twice the speed limit, he still drove right up the middle of a winding, residential street with traffic on both sides, with no effort to slow down or

to swerve out of the way of those vehicles – all while being chased by two other cars. Considering it was about 7:15 p.m., and considering petitioner had already struck two cars, he was still aware of the deadly risk that his conduct presented to other drivers.

41. These factual details make the Appellate Division, Second Department's decision in People v. Williams, 150 A.D.3d 1273 (2d Dept. 2017), *lv. denied* 29 N.Y.3d 1135 (2017), particularly instructive. There, an intoxicated defendant fled from a fight with a bouncer, and then from police, at 3 a.m. The defendant traveled between 60 and 70 miles per hour in defiance of a speed limit of 30. He ran several red lights and stop signs without slowing down. Barreling into an intersection wherein the defendant's traffic light was likely red, he struck another car, instantly killing its occupant. Id., 150 A.D.3d at 1274. The court held that "the evidence proved beyond a reasonable doubt that the defendant recklessly engaged in conduct which created a grave risk of death to another person." Id. at 1276. In explaining its conclusion, the court referenced the defendant's revoked driver license and his intoxicated state. It also, in much further detail, discussed the fact that "the defendant engaged in a high-speed chase with the police for approximately two miles" and the fact that "during this case, the defendant sped through narrow streets of a residential neighborhood, traveling at speeds of more than double the legal limit. The defendant also ran through numerous stop signs and red traffic lights, without slowing down." Id.

42. At one particular intersection, "the critical video footage, and other evidence from the crash scene, demonstrated that the defendant sped into [it] without braking or swerving, notwithstanding that a car with its headlights on was approaching the intersection, which the defendant missed by mere seconds, only to

15

strike [the victim's] vehicle immediately thereafter." Id. See also People v. Walker, 258 A.D.2d 541, 541 (2d Dept. 1999) ("[W]e find that it was legally sufficient to establish beyond a reasonable doubt that the defendant demonstrated a depraved indifference to human life and created a grave risk of death to others by driving a stolen car at speeds as high as 80 to 100 miles per hour, in excess of the posted speed limit, towards oncoming traffic, and through a stop sign and numerous read lights") (internal citations omitted). In other words, evidence that the defendant failed to swerve during a mere *portion* of his chase was sufficient to uphold the People's proof of depraved indifference.

43. If petitioner's underlying theory is that a defendant whose main purpose is to flee from police cannot be guilty of depraved-indifference reckless endangerment, then his theory cannot be right. In Maldonado, for example, the Court of Appeals was forced to clarify that the *opposite* proposition was not necessarily true. See id., 24 N.Y.3d at 57 ("A defendant may simultaneously intend to flee police and avoid striking other cars or pedestrians.") The court also suggested that evidence supporting the view that a defendant's erratic driving "was motivated solely by his intent to evade capture, regardless of the risk to human life," would have produced a different outcome. Id.

44. Similarly, the fact that the defendant in Williams was evading police did not abrogate that court's conclusion that he had acted with depraved indifference to human life. Nor should it have. If a defendant's desire to evade capture is strong enough that it leads him to drive in a manner that displays no regard for others' grave risk of death, that underlying purpose can hardly excuse the gravely dangerous maneuvers he might make along the way.

45. In sum, petitioner drove in a fashion reflecting absolutely no care for the consequences of his driving. This undoubtedly established that he drove with depraved indifference to human life. Thus, New York courts' findings of evidentiary sufficiency were not unreasonable applications of clearly established law as determined by the Supreme Court. 28 U. S. C. § 2254(d). See generally Ford v. Ercole, 594 F. Supp. 2d 281 (E.D.N.Y. 2009).

WHEREFORE, the writ should be denied.

Dated:   October 19, 2020
         Staten Island, New York

                                        [ECF signature on file]
                                        Alexander Fumelli
                                        Assistant District Attorney

To:   Mark Vorkink, Esq.
      Attorney for Petitioner
      Appellate Advocates
      111 John Street, 9th Floor
      New York, New York 10038
      [via ECF]